## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
_____

**Jennifer Seelig,**

                        Plaintiff,

     v.

**Ramsey County, Minnesota,**
**Inmate Services Corporation,**
**Rogeric Hankins** (individual capacity)**,**
**& Randy Cagle Jr.** (individual capacity)**,**

                 Defendants.

Case No. 24-CV-1732

**First Amended Complaint**
**(Jury Trial Requested)**

_____

## INTRODUCTION

1. In April 2020, in what the DOJ called a "particularly heinous case," Rogeric Hankins abused his authority as a prison transport employee to rape and sexually assault Jennifer Seelig while she was in his custody.

2. Acting on behalf of Ramsey County, Hankins transported Seelig from Washington State to Ramsey County to appear on a DUI warrant.

3. After delivering the other detainees, and after waiting for his colleague to fall asleep, Hankins took Seelig to a roadside rest stop and raped her.

4.  Hours later, Hankins tried to rape Seelig again under similar circumstances – groping her and attempting to remove her clothing. He only stopped when Seelig told him she was bleeding from injuries she sustained during the earlier rape.

5.  Ramsey County contracted with Inmate Services Corporation (ISC) (Hankins's employer) to transport individuals like Seelig to Ramsey County to appear on arrest warrants.

6.  Prison transport companies like ISC give their employees unchecked power over restrained and vulnerable detainees. They shackle detainees, load them into vans, and zigzag across the country for days and weeks at a time – controlling every aspect of the detainees' lives.

7.  Under these conditions, physical and sexual abuse by prison transport employees is a well-known and foreseeable hazard in the industry. *See* "Private Prisoner Vans' Long Road of Neglect," *New York Times*, https://www.nytimes.com/2016/07/07/us/prisoner-transport-vans.html (July 6, 2016) (Exhibit A).

8.  Despite the foreseeable hazard of employee abuses, ISC does ***nothing*** to prevent its employees from violating detainees' constitutional rights.

9.  In fact, in the two years before Hankins raped Seelig, other ISC employees raped other detainees in nearly identical circumstances – including in 2019 while transporting another detainee to Ramsey County. *See Sivels v. Ramsey County et al.*, 23-CV-894 (DWF/TNL) (D. Minn. 2023). Even after learning of the pattern of identical misconduct, ISC did nothing to prevent future violations. It maintained a policy of deliberate indifference.

10. Similarly, Ramsey County knew or should've known of ISC's pattern of constitutional violations before it contracted with ISC and before Hankins raped Seelig. Despite an ISC employee raping a Ramsey County detainee in 2019, just one year before Hankins raped Seelig, Ramsey County did nothing to prevent future rapes or sexual assaults. It maintained its contract with ISC and, in doing so, maintained a policy of deliberate indifference to the constitutional violations happening under its nose.

11. "No degree of sexual assault by [an officer] acting under color of law could ever be proper." *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 796 (8th Cir. 1998). And no degree of ***indifference*** to sexual assault can ever be proper.

12. This lawsuit seeks to hold Ramsey County, ISC, Hankins, and ISC's president accountable for their actions and inactions.

## JURISDICTION & VENUE

13. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it states federal claims under 42 U.S.C. § 1983.

14. This Court has supplemental subject matter jurisdiction over this action under 28 U.S.C. § 1367 because the state claims "are so related to" the federal claims "that they form part of the same case or controversy."

15. This Court is a proper venue over this action under 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" in this State and District.

## PARTIES

16. Jennifer Seelig is a citizen of Minnesota and a former resident of Red Wing, Minnesota. Currently, Seelig is a resident in a Minnesota correctional facility in Shakopee, Minnesota.

17. Ramsey County is a political subdivision of the State of Minnesota. Ramsey County contracted with ISC to perform the governmental functions of executing arrest warrants and transporting detainees to Ramsey County correctional facilities.

18. Inmate Services Corporation (ISC) is an Arkansas corporation headquartered in West Memphis, Arkansas. ISC has contracts with various state and local governments (including Ramsey County) to "transport[] prisoners at all security levels coast to coast by ground or via aircraft."

19. Upon information and belief, Rogeric Hankins is a citizen of Arkansas. At all times relevant to this complaint, Hankins was an employee of ISC and performed duties under ISC's contract with Ramsey County. Hankins is currently in BOP custody, serving a prison sentence for the misconduct described in this Complaint.

20. Upon information and belief, Randy Cagle Jr. is a citizen of Arkansas and a resident of West Memphis, Arkansas. At all times relevant to this complaint, Cagle was ISC's president and Hankins's supervisor.

## FACTS

### *The Private Prison Transport Industry*

21. When people with active arrest warrants move to a different jurisdiction, the home jurisdiction must extradite them to execute the arrest warrants.

22. Because it is expensive to dispatch employees to retrieve people from out-of-state, many state and local governments contract with private companies like ISC to detain and transport people to their home jurisdiction.

23. When hiring private companies to extradite wanted individuals, state and local governments rarely (if ever) take steps to ensure compliance with detainees' constitutional rights. *See* Exhibit A at 7 ("Jurisdictions that hire the companies often disavow responsibility for prisoners not under their direct custody.").

24. Lacking meaningful oversight, private prison transport companies focus on profit over other concerns.

25. For example, because the companies are typically paid "per prisoner per mile," they pack detainees into transport vehicles like sardines. To maximize travel time (and maximize profit), the companies strictly limit food and bathroom breaks, and they categorically prevent detainees from sleeping in beds. As a result, detainees can spend *weeks* in a transport vehicle, with minimal food and minimal opportunities to sleep. *See* Exhibit A at 7-9.

26. Additionally, the companies don't train their transport employees about detainees' constitutional rights – which include the right to safe conditions of confinement, necessary medical care, and protection from pretrial punishment. *See id.* at 6 (training "is often limited to a tutorial on handcuffs and pepper spray"); *see also, e.g.*, *Stearns v. Inmate Services Corp.*, 957 F.3d 902, 906 (8th Cir. 2020) (discussing right to be free of pretrial punishment and right to non-punitive conditions of confinement).

27. Shackled in a vehicle for days and weeks at a time, detainees are at the mercy of untrained private transport employees. And transport employees regularly abuse their power.

28. Numerous detainees have died in the custody of private prison transport companies – due to refusals to provide medical care, accidents resulting from negligent driving, etc.

29. Most relevant to this case, numerous detainees have sued private prison transport companies for sexual assault. *See, e.g.*, Exhibit A at 6 (in 2016: "At least 14 women have alleged in criminal or civil court since 2000 that they were sexually assaulted by guards while being transported by these companies."); "KARE 11 Investigates: Private Guards, No Oversight, a

7

Pattern of Rape," *KARE 11*, https://www.kare11.com/video/news/investigations/kare-11-investigates-private-guards-no-oversight-a-pattern-of-rape/89-66742275-79f1-401c-9210-10e74b8d25ab (Nov. 8, 2023) (Exhibit E) at 19 (in 2023: "KARE's investigation has to date tied ISC and five of its guards to 21 sex assault allegations in the last 10 years."). On information and belief, countless other detainees have been sexually assaulted without making formal claims in court.

30. When confronted with the shocking mistreatment of detainees in his company's care, ISC president Cagle deflected responsibility – claiming that "prisoners lied or sued frivolously." Exhibit A at 11. Cagle has referred to another individual suing ISC for misconduct as "a damn fool." And he resorted to profanity when confronted with his employees' sexual misconduct against detainees. Exhibit E at 13.

31. Because private prison transport companies operate under contract with state and local governments like Ramsey County, their constitutional violations flow from the state-law authority granted to them by government entities.

*Ramsey County Contract*

32. In 2018, Ramsey County entered a contract with ISC to extradite wanted individuals – paying over $90,000 per year for ISC's services.

33. For several years before entering a contract with ISC, Ramsey County contracted with at least one other private prison transport company.

34. Upon information and belief, Ramsey County knew that employees of the other private prison transport company (or companies) sexually assaulted at least one female Ramsey County detainee – and perhaps other female detainees from other jurisdictions.

35. Before contracting with ISC, Ramsey County knew or should have known about the rampant abuses in the private prison transport industry. Such abuses were heavily publicized in the years and months before Ramsey County contracted with ISC. And Ramsey County had actual knowledge that its prior contractor's employees had sexually assaulted at least one Ramsey County detainee.

36. Before contracting with ISC, Ramsey County knew or should have known about the rampant abuses *at ISC specifically*, including a pattern of assaults, neglect, and detainee deaths.

37. In fact, the following public examples of ISC's pattern of constitutional violations arose during the 3 years preceding Ramsey County's decision to enter a contract with ISC. Ramsey County knew or should have known about the allegations described in each case (all of which avoided summary judgment and/or were voluntarily settled by ISC):

   a. In August 2017, a putative class of detainees alleged that ISC withheld medication, denied access to hygiene and sleep, and kept detainees shackled continuously for five-plus days. *See Peters v. Inmate Services Corp.*, 17-cv-1660 (N.D. Ohio). The *Peters* case ultimately joined with another similar class action, which the Eighth Circuit ratified and allowed to proceed. *See Stearns v. Inmate Services Corp.*, 957 F.3d 902 (8th Cir. 2020). ISC settled the claims. *See* "Individuals Who Were Transported Fully Restrained by Inmate Services Corporation for 24 Hours or More Could Get Money from a Settlement," *PR Newswire*, https://www.prnewswire.com/news-releases/individuals-who-were-transported-fully-restrained-by-inmate-services-corporation-for-24-hours-or-more-could-get-money-from-a-settlement-301809918.html (May 1, 2023) (Exhibit F).

b.  In April 2017, a female detainee alleged that an ISC transport employee named Chris Weiss sexually assaulted and raped her during transport, in addition to denying her access to hygiene and sleep. *See Jackson v. Inmate Services Corp.*, 17-cv-1277 (D. Ariz.). The detainee avoided summary judgment on several claims, *id.* at Doc. 179, and ISC eventually settled.

c.  In March 2017, a detainee alleged that ISC denied him medication and clothing for the entirety of a fifteen-day transport, even when he demonstrated signs of acute medical distress. *See Hastings v. Inmate Services Corp.*, 17-cv-145 (M.D. Fla.). The detainee further alleged that ISC employees' reckless driving resulted in an accident requiring emergency services. *Id.* ISC settled the claims.

d.  In February 2017, a detainee avoided summary judgment on his claims that ISC denied him medical care for his diabetes – such that the detainee passed out and ultimately required amputation of both legs. *See Dykes v. Inmate Services Corp.*, 2017 WL 496065 (D.S.C. Feb. 7, 2017).

e.  In May 2015, a female detainee alleged that an ISC transport employee named James Williams sexually assaulted her during transport, in addition to excessively yanking her shackles, denying her access to hygiene, and failing to seatbelt her during the continuous six-day transport. *See Metcalf v. Inmate Services Corporation*, 15-cv-139 (E.D. Ark.). ISC settled the claims.

38. Indeed, based on ISC's pattern and history of constitutional violations, while Ramsey County was **entering** a contract with ISC, other jurisdictions were **terminating** their contracts with ISC, due to ISC's abysmal record. *See* "Inmate transport company connected to suicide has history of escapes, lawsuits," *Springfield News-Leader*, https://www.news-leader.com /story/news/crime/2018/05/25/inmate-services-corporation-transport-company-involved-thursday-suicide-has-murky-past/644278002/ (May 25, 2018) (Exhibit B) (discussing detainee death in ISC custody, and several other allegations); "Green County paid $100,000+ for inmate transport year after year but never had contract," *Springfield News-Leader*, https://www.news-leader.com/story/news/local/ozarks/2018/12/12/greene-

[county-inmate-services-corporation-no-contract/2271345002/](county-inmate-services-corporation-no-contract/2271345002/) (Dec. 12, 2018)

(Exhibit C) (discussing termination of ISC contract).

39. Despite its actual and constructive knowledge, Ramsey County did nothing to protect detainees from abuses by ISC and its untrained transport employees. Instead, it adopted a policy of indifference.

40. Ramsey County chose ISC, not because of any safety assurances, but because it was the lowest bidder.

41. While Ramsey County purported to require ISC to respect detainees' constitutional rights, it did so purely on an honor system – notwithstanding the pattern of abuses within the private prison transport industry, and within ISC specifically. Ramsey County required ISC to take certain precautionary measures (background checks, trainings, etc.) but only "reserve[d] the right" to hold ISC accountable for complying with those measures. In other words, Ramsey County didn't actually hold ISC accountable for the bare minimum precautions required in the contract.

42. And in fact, ISC blatantly disregarded its contractual obligations. While claiming to provide a comprehensive 40-hour training program for each employee, ISC in fact provided a cursory 35-minute training that didn't

cover detainees' constitutional rights. *See* Exhibit E at 24 (statement from ISC employee: "Probably about 35 minutes, 45 tops.").

43. Despite its actual and constructive knowledge that ISC, like other private prison transport companies, frequently violates detainees' constitutional rights – including by sexually assaulting or raping female detainees – Ramsey County was indifferent to ISC's lack of training and false representations to the contrary.

44. Similarly, Ramsey County purported to enforce a "zero-tolerance standard against sexual assault." But it relied on ISC to "self-monitor" for violations of that standard, while maintaining the remote possibility of "conduct[ing] announced or unannounced . . . 'on-site' monitoring." In other words, Ramsey County didn't actually supervise or observe ISC's interaction with detainees. Nor did it actually supervise for compliance with its "zero-tolerance standard against sexual assault."

45. Despite its actual and constructive knowledge that ISC's employees, like those of other private prison transport companies, frequently sexually assault or rape female detainees, Ramsey County was indifferent to ISC's actual practices when transporting detainees.

46. And Ramsey County purported to require ISC to staff female guards whenever it transported female detainees, or alternatively to operate audio/video recording of the entire transport. Minnesota law **required** Ramsey County to impose these safeguards. *See* Minn. Stat. § 631.412.

47. Despite its actual and constructive knowledge that ISC's employees, like those of other private prison transport companies, frequently sexually assault or rape female detainees, Ramsey County was indifferent to its statutory obligations to take basic precautions to deter such constitutional violations.

48. In fact, Minnesota law requires private prison transport companies to be licensed as "protective agents" by the State Board of Private Detective and Protective Agent Services. *See* Minn. Stat. § 326.32 *et seq.* Since 2015, the State Board has explicitly interpreted its statutory mandate to include regulation of private prison transport companies. *See* Exhibit G at 10 (April 28, 2015 meeting minutes: "Hodsdon moved that the Board make a finding that if someone is paid to provide prisoner transports that they do fall within the scope of being a protective agent. … The motion passed with a 3:1 vote.").

49. ISC has never been licensed to legally operate as a protective agent in Minnesota.

50. Despite its actual and constructive knowledge that ISC's employees, like those of other private prison transport companies, frequently sexually assault or rape female detainees, Ramsey County was indifferent to ISC illegal operation in Minnesota.

### The Sexual Assaults at Issue

51. On March 31, 2020, ISC picked up Seelig in Washington State, to be transported to Ramsey County for a DUI warrant.

52. Two male ISC employees operated the transport vehicle in alternating shifts – Rogeric Hankins and Jason Deneku.

53. The transport vehicle did not have audio or video recording capabilities.

54. By April 2, 2020, after 3 days picking up and dropping off detainees in the Southwest, Seelig was the last detainee remaining in the transport vehicle with the two male transport employees.

55. Hankins immediately took advantage of the situation. He told Seelig that they finally had some "free time" together, and he made sexual comments about her body.

56. In the early morning hours of April 3, 2020, while Hankins drove the transport vehicle through Missouri, Deneku fell asleep in the passenger seat.

57. While Deneku slept, Hankins pulled the vehicle into a rest stop and brought Seelig into the men's bathroom while she remained partially shackled.

58. In the men's bathroom, Hankins pulled Seelig's shirt up while she tried to stop him. Hankins grabbed Seelig by the hair, turned her around, pulled her pants down as Seelig resisted, and raped her.

59. After the rape, Hankins re-shackled Seelig and returned her to the transport vehicle.

60. When Deneku woke up and took over driving, Hankins peppered Seelig with comments about her body and her tattoos. And he scrolled through photos on her social media profiles.

61. Hours later, Hankins resumed driving and Deneku slept. Again, Hankins took advantage of the situation.

62. At the earliest opportunity, Hankins pulled into another rest stop – this time in Owatonna, Minnesota.

63. When the vehicle stopped, Deneku woke up.

64. With Deneku watching, Hankins asked Seelig if she wanted to use the bathroom (instead of bringing her into the rest stop without a request).

65. Seelig refused. But Hankins ignored her refusals and kept insisting until she relented.

66. Deneku remained in the vehicle while Hankins took Seelig into the rest stop.

67. Hankins partially unshackled Seelig and allowed her to use the women's bathroom while he waited outside.

68. Alone in the bathroom, Seelig had the foresight to put toilet paper in her underwear to preserve Hankins's DNA from the earlier rape.

69. When Seelig left the bathroom, Hankins ordered her into the men's bathroom. Seelig refused, but Hankins pulled her into the bathroom.

70. In the men's bathroom, Hankins kissed and groped Seelig. As he began to remove her clothes to rape her again, Seelig told Hankins she was bleeding from the earlier rape.

71. Only then did Hankins end his assault.

72. Hankins re-shackled Seelig and returned her to the transport vehicle.

73. When the vehicle arrived at the Ramsey County Detention Center, Seelig's multi-day nightmare finally ended. She began to cry.

74. Hankins ordered Seelig to stop crying because she looked weak. As Hankins switched her shackles from the front of her body to the back (as required by the Detention Center), he whispered to Seelig that her arrival at the Detention Center "hurts him more than it hurts her."

75. During intake at the Ramsey County Detention Center, Seelig caught the attention of a female corrections officer and reported Hankins's multiple assaults.

76. Seelig underwent a sexual assault exam, which conclusively established that she had been raped.

77. Hankins was federally indicted and pleaded guilty to a felony violation of "Deprivation of Rights Under Color of Law." *See United States v. Rogeric Hankins*, 22-CR-3125-MDH (W.D. Mo. 2022). In the process of pleading guilty, Hankins admitted to engaging in the sexual misconduct detailed in this Complaint.

78. Hankins is serving a 108-month prison sentence.

### *ISC's Pattern of Violations*

79. Hankins's appalling sexual misconduct fits a pattern of similar violations by ISC transport employees.

80. Indeed, several instances of sexual misconduct by ISC employees exist in the public record. As such, Ramsey County had at least constructive notice of ISC's pattern of violations. *See* "Notice," Black's Law Dictionary (11th ed. 2019) ("constructive notice. (18c) Notice arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of, such as … a pending lawsuit; notice presumed by law to have been acquired by a person and thus imputed to that person."); *see also Doe v. Fort Zumwalt R-II Sch. Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019) (recognizing that liability is "premised on obviousness or constructive notice" (quotation omitted)).

81. As identified above, before entering its contract with ISC, Ramsey County contracted with a private prison transport company whose employees had sexually assaulted at least one Ramsey County detainee.

82. Beyond this actual knowledge that sexual assaults occurred under its prior contract, Ramsey County also had specific notice that ISC employees also raped and/or sexually assaulted female detainees. *See Jackson v. Inmate Services Corp.*, 17-cv-1277 (D. Ariz.); *Metcalf v. Inmate Services Corporation*, 15-cv-139 (E.D. Ark.).

83. Even so, Ramsey County contracted with ISC.

84. Even after contracting with ISC, Ramsey County had notice of **additional** instances of ISC employees raping and/or sexually assaulting female detainees.

85. In 2018, before Hankins raped Seelig, an ISC transport officer named Marius Nesby followed a female detainee into the women's bathroom at a rest stop and raped her. *See* "Contract worker charged with prisoner abuse," *Quad-City Times*, https://qctimes.com/news/local/article_855aaede-06a3-58ba-a398-05b2a1c53401.html (Oct. 16, 2018) (Exhibit D).

86. In 2019, before Hankins raped Seelig, a female detainee sued ISC and Nesby in Wisconsin state court – later removed to federal court. *See Arenz v. Inmate Services Corp.*, 19-cv-949 (E.D. Wis.). The detainee ultimately won default judgment against ISC. *See Arenz v. Inmate Services Corp.*, 2022 WL 93509 (E.D. Wis. Jan. 10, 2022).

87. In June 2019, before Hankins raped Seelig, an ISC transport officer named Marquet Johnson followed a female detainee into the bathroom at a rest stop and raped her. Johnson raped the detainee **while transporting her to the**

***Ramsey County Detention Center***. *See Sivels v. Ramsey County et al.*, 23-CV-894-DWF-TNL (D. Minn. 2023).

88. Johnson was charged with federal crimes in the District of New Mexico. He pleaded guilty and awaits sentencing. The charged offense relates to a ***different*** instance of Johnson raping a detainee at gunpoint while transporting her as an ISC employee. *See United States v. Marquet Johnson*, 23-cr-92-KWR (D.N.M.) (Doc. 2).

89. Beyond the charged offense, the DOJ has "considerable evidence" that Johnson "sexually assaulted at least 10 more female detainees in his custody" while working for ISC. *See id.* (Doc. 5 at 1-2).

90. In 2020, after Hankins raped Seelig, another female detainee sued ISC after Nesby raped her. *See Hampton v. Inmate Services Corp.*, 20-cv-4210 (C.D. Ill.).

91. Upon information and belief, there are ***many*** more instances of ISC transport officers raping or otherwise sexually assaulting female detainees in their custody. And, upon information and belief, Ramsey County, ISC, and Cagle are aware of many – if not all – instances.

92. Even so, Ramsey County maintained its contract with ISC.

93. Due to the pattern of sexual misconduct toward detainees, both within the broader private prison transport industry and by ISC specifically, Ramsey County had actual and constructive knowledge of a pattern of constitutional violations.

94. Ramsey County knew or should have known that its contractual relationship with ISC caused the violation of Seelig's (and others') constitutional rights.

95. Simply put, despite notice of ISC's pattern of constitutional violations, Ramsey County did nothing – which amounted to a policy of deliberate indifference. It failed to terminate its contract with ISC, demand training in accordance with its contract with ISC, or otherwise take action to prevent the appalling conduct that occurred under the banner of its state-law authority.

## COUNT 1
### *MONELL* LIABILITY
### 42 U.S.C. § 1983
### (Defendant Ramsey County, Defendant Inmate Services Corporation)

96. All paragraphs of this Complaint are incorporated here.

97. Section 1983 provides a cause of action against a municipality if its own action or inaction caused a constitutional violation. A municipality causes a

constitutional violation by: **(1)** adopting a facially unconstitutional policy, or **(2)** demonstrating deliberate indifference to "known or obvious consequences" of its conduct. *See Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007) (en banc) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)).

98. A municipality demonstrates deliberate indifference by failing to safeguard against constitutional violations despite notice that such violations are likely. *See Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013) ("Notice is the touchstone of deliberate indifference.").

99. "As applied to a municipality in the Fourteenth Amendment context, 'deliberate indifference' is purely objective: liability may be premised on ***obviousness or constructive notice***." *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (cleaned up) (emphasis in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)).

100. Private companies acting under color of state law are subject to the same analysis applied to a municipality. *See Royster v. Nichols*, 698 F.3d 681, 692-93 (8th Cir. 2012) (assuming private security firm is a state actor and applying municipality analysis).

101.    Ramsey County and ISC had actual or constructive notice of a pattern of constitutional violations by their transport officer agents.

102.    Before Hankins raped and sexually assaulted Seelig, Ramsey County knew that employees of its prior private prison transport contractor had raped and/or sexually assaulted a female Ramsey County detainee.

103.    Before Hankins raped and sexually assaulted Seelig, Ramsey County and ISC knew or should have known that ISC's transport officers had similarly raped and/or sexually assaulted numerous female detainees before the contract period and during the contract period. Instances of these similar constitutional violations resulted in numerous lawsuits against ISC and were heavily publicized in major media outlets – thereby providing constructive notice to Ramsey County. *See Gunn v. City of Montgomery, Ala.*, 16-CV-557-WKW-WC, 2017 WL 422496, at *7 (N.D. Ala. Mar. 2, 2017), *report and recommendation adopted* 2017 WL 1102718 (M.D. Ala. Mar. 24, 2017) (regarding lawsuits alleging past violations: "[C]ourts have affirmed that … the sorts of records identified by Plaintiff in this matter can be sufficient to put a supervisor on notice of a need to correct a problem …" (citing cases)). Because these occasions draw solely from public court filings and news

coverage, they almost certainly underestimate the scope of the pattern of violations.

104.    Most relevantly, just one year before Hankins raped and sexually assaulted Seelig, an ISC transport officer raped **another female Ramsey County detainee** under nearly identical circumstances. Upon information and belief, Ramsey County knew of this incident before Hankins raped Seelig.

105.    Beyond Ramsey County's notice of a pattern of sexual assaults, it also had notice of a pattern of various other constitutional violations perpetrated by ISC and its employees – relating to deprivation of medical care and unconstitutional conditions of confinement. And Ramsey County had notice of a broader pattern of constitutional violations in the private prison transport industry generally.

106.    Despite their notice of a pattern of constitutional violations, Ramsey County and ISC did nothing to safeguard against future violations.

107.    Ramsey County's contract with ISC reserved the right to demand proof of trainings and background checks, and to directly monitor ISC transports on an unannounced basis. The contract also purported to take a

zero-tolerance approach to sexual assault, and allowed Ramsey County to terminate the contract for any violation.

108.    And Minnesota law required female transport employees to be present for any transports involving female detainees. Minn. Stat. § 631.412. It further requires private prison transport companies to be meet certain requirements and be licensed to operate in the State. *See* Minn. Stat. § 326.32 *et seq.*

109.    But instead of taking any action under the contract, complying with Minnesota law, or otherwise addressing the pattern of constitutional violations, Ramsey County adopted a policy of indifference. *See Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) ("The city's 'policy of inaction' in light of notice that is program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." (quotation omitted)).

110.    Ramsey County and ISC's deliberate indifference caused the violation of Seelig's rights.

111.    Ramsey County and ISC's violation of Seelig's rights was the result of malice and/or reckless disregard for her rights.

112.    Seelig is entitled to recover damages for Ramsey County and ISC's

unlawful conduct, including punitive damages, costs, and attorney fees.

## COUNT 2
## FAILURE TO SUPERVISE
## 42 U.S.C. § 1983
## (Defendant Ramsey County, Defendant Inmate Services Corporation, Defendant Randy Cagle Jr.)

113.    All paragraphs of this Complaint are incorporated here.

114.    Section 1983 provides a cause of action against municipalities and

individual supervisors if a "failure to . . . supervise the offending actor

caused [a constitutional] violation." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th

Cir. 2007) (individual supervisors); *Atkinson*, 709 F.3d at 1216-17

(municipalities).

115.    A municipality or supervisor is liable for failure to supervise if they:

**(1)** "[r]eceived notice of a pattern of unconstitutional acts committed by

subordinates"; **(2)** "[d]emonstrated deliberate indifference to or tacit

authorization of the offensive acts"; **(3)** [f]ailed to take sufficient remedial

action"; and **(4)** "such failure proximately caused injury to" the plaintiff.

*Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010) (quotation omitted).

116.    For claims against a municipality, an objective standard applies: "liability may be premised on obviousness or ***constructive notice***" of a pattern of constitutional violations. *Walton*, 752 F.3d at 1117 (quotation omitted) (emphasis in original). For claims against an individual supervisor, a subjective standard applies: "no liability attaches unless the official ***knows of*** and disregards an excessive risk to inmate health and safety." *Id.* (quotation omitted) (emphasis in original).

117.    As addressed in Count 1 above, Ramsey County and ISC had actual or constructive notice of "a pattern of unconstitutional acts committed by subordinates." But both entities chose to remain deliberately indifferent and failed to take remedial action, which caused Seelig's injury.

118.    Cagle had actual knowledge of the pattern of violations by his subordinates. Cagle was named as a defendant or otherwise notified of several lawsuits alleging similar or identical constitutional violations as the ones raised in this Complaint. On multiple occasions, news outlets confronted Cagle with evidence of constitutional violations by his subordinates. But Cagle demonstrated his deliberate indifference and unwillingness to take remedial action – reflexively accusing the detainee-

victims of lying and launching profanity-laden attacks on news outlets.

Cagle's utter refusal to supervise his employees to prevent sexual assault

proximately caused Seelig's sexual assault by one of Cagle's employees.

119.   Ramsey County, ISC, and Cagle's violation of Seelig's rights was the

result of malice and/or reckless disregard for her rights.

120.   Seelig is entitled to recover damages for Ramsey County, ISC, and

Cagle's unlawful conduct, including punitive damages, costs, and attorney

fees.

## COUNT 3
## VIOLATION OF THE FOURTEENTH AMENDMENT
### 42 U.S.C. § 1983
### (Defendant Rogeric Hankins)

121.   All paragraphs of this Complaint are incorporated here.

122.   Section 1983 provides a cause of action against anyone who deprives

an individual of her rights under the Constitution, while acting under color

of state law.

123.   It is self-evident that the Constitution protects individuals from being

sexually assaulted or raped by a government actor – regardless of whether

the individual is detained pending trial or imprisoned after a conviction. *See*

*Williams v. Prudden*, 67 F. App'x 976, 977-78 (8th Cir. 2003) (collecting cases).

124.     Hankins violated Seelig's rights by raping and sexually assaulting her during transport to the Ramsey County Detention Center.

125.     Because Hankins violated Seelig's rights while acting under authority granted by Ramsey County, Hankins acted "under color of state law" and is subject to § 1983 liability. *See West v. Atkins*, 487 U.S. 42, 55-56 (1988) (private entities "voluntarily assume[]" constitutional obligations when contracting with state or municipality).

126.     Because Hankins worked for a private corrections contractor (ISC), he is not entitled to the protections of qualified immunity. *See Richardson v. McKnight*, 521 U.S. 399, 412 (1997).

127.     Hankins's violation of Seelig's rights was the result of malice and/or reckless disregard for Seelig's rights.

128.     Seelig is entitled to recover damages for Hankins's unlawful conduct, including punitive damages, costs, and attorney fees.

### COUNT 4
### SEXUAL ASSAULT & BATTERY
### (Defendant Rogeric Hankins)

129.     All paragraphs of this Complaint are incorporated here.

130.     Minnesota law provides causes of action for assault and battery.

131.    "An assault is an unlawful threat to do bodily harm to another with present ability to carry the threat into effect." *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939).

132.    Battery is "an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

133.    Under Minnesota law, "sexual abuse" is a subspecies of assault and battery that meets the criteria of criminal sexual conduct. *See* Minn. Stat. § 541.073, subd. 1(1).

134.    Hankins sexually assaulted and battered Seelig by groping her, removing her clothing, raping her, and otherwise making unwanted physical contact with her.

135.    Hankins's conduct was "sexual abuse" because he used force and caused bodily harm to Seelig, and because he had a "prohibited occupational relationship" with her – as a contractor of a "county . . . correctional system." *See* Minn. Stat. §§ 609.343, subd. 1(c); 609.344, subd. 1(c)-(d); *see also* Minn. Stat. § 609.341, subd. 3, 24 (definitions of "force" and "prohibited occupational relationship").

136.     Hankins's conduct was the result of malice and/or reckless disregard for Seelig's rights.

137.     Seelig is entitled to recover damages for Hankins's unlawful conduct, including punitive damages,[1] costs, and attorney fees.

## COUNT 5
## SEXUAL ASSAULT & BATTERY – VICARIOUS LIABILITY
### (Defendant Inmate Services Corporation)

138.     All paragraphs of this Complaint are incorporated here.

139.     Minnesota law provides a cause of action against an employer for the intentional torts of its employee.

140.     "Under the well-established principle of respondeat superior, an employer is vicariously liable for the torts of an employee committed within the course and scope of employment." *Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999) (quotation omitted).

---

[1] A "large majority" of courts in the District of Minnesota allow plaintiffs to pursue punitive damages for their state-law claims per the basic pleading rules of the Federal Rules of Civil Procedure, rather than the gatekeeping rules of Minn. Stat. §§ 549.191, 549.20. *Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 398-400 (D. Minn. 2020).

141.     For intentional torts, the employer is liable if the employee's misconduct: **(1)** "is related to the duties of the employee" and **(2)** "occurs within work-related limits of time and place." *Id.* (quotation omitted).

142.     An employee's misconduct "is related to the duties of the employee" if the misconduct was "foreseeable" to the employer. *Id.* at 911. The "foreseeability" analysis considers the employer's industry as a whole – such that "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* at 912 (quotation omitted). In simple terms, an employee's misconduct is foreseeable and related to his duties if the misconduct is a "well known hazard" in the employer's industry. *See id.*

143.     ISC is liable for Hankins's sexual assault and battery under the respondeat superior doctrine.

144.     Hankins's misconduct was related to his duties because sexual assault is a well known hazard in the private prison transport industry and, therefore, is a foreseeable risk that ISC must bear as a cost of business. Hankins's duties allowed him to be alone with Seelig, to shackle her, and

exert force and authority over her. And, as demonstrated by court cases and journalist investigations, sexual assault is all-too-common in ISC's industry – indeed it is all-too-common at ISC specifically.

145.     Hankins's misconduct occurred within work-related limits of time and place because he raped and sexually assaulted Seelig while transporting her to the Ramsey County Detention Center as a representative of ISC, and while performing on ISC's contract with Ramsey County.

146.     ISC is vicariously liable to Seelig for damages caused by its employee's unlawful conduct, including punitive damages,[2] costs, and attorney fees.

## COUNT 6
## NEGLIGENCE
### (Defendant Inmate Services Corporation, Defendant Randy Cagle Jr.)

147.     All paragraphs of this Complaint are incorporated here.

148.     Minnesota law imposes a duty on employers to supervise their employees. "Negligent supervision is the failure of an employer to exercise

---

[2] A "large majority" of courts in the District of Minnesota allow plaintiffs to pursue punitive damages for their state-law claims per the basic pleading rules of the Federal Rules of Civil Procedure, rather than the gatekeeping rules of Minn. Stat. §§ 549.191, 549.20. *Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 398-400 (D. Minn. 2020).

ordinary care in supervising the employment relationship so as to prevent foreseeable misconduct of an employee from causing harm to others." *Olson v. First Church of Nazarene*, 661 N.W.2d 254, 264-65 (Minn. App. 2003).

149.    Negligent supervision derives from the doctrine of respondeat superior and, therefore, adopts a "foreseeability" analysis that considers the employer's industry as a whole. *See L.M. ex rel. S.M. v. Karlson*, 646 N.W.2d 537, 545 (Minn. App. 2002) (relying on foreseeability analysis from respondeat superior discussion).

150.    Minnesota law also imposes a duty on employers to act reasonably in the hiring of employees. "Negligent hiring is the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of employment, it should have been foreseeable that the hired individual posed a threat of injury to others." *M.L. v. Magnuson*, 531 N.W.2d 849, 857 (Minn. App. 1995) (quotation omitted).

151.    Minnesota law also imposes a duty on employers to act reasonably in the retention of employees. "Negligent retention . . . arises when, during the

36

course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." *Id.* (quotation omitted).

152.    ISC and Cagle breached their duty to exercise ordinary care in supervising their employees. They had no method for monitoring their employees when interacting with female detainees. In fact, they flatly ignored provisions in the contract with Ramsey County requiring a female officer to be present on transports involving female detainees. Simply put, ISC and Cagle *in no way* supervised their employees as to their treatment of female detainees.

153.    As addressed in Count 5 above, Hankins's misconduct was a foreseeable risk that ISC must bear as a cost of business.

154.    ISC and Cagle also breached their duties to reasonably hire employees. Hankins had sexually assaultive propensities that ISC and Cagle could have discovered through reasonable pre-hiring investigation. Specifically, the circumstances of Hankin's employment involved close and unsupervised interactions with vulnerable female detainees. But ISC and

Cagle did not reasonably investigate Hankins's (or other ISC employees') backgrounds relating to sexual misconduct. Based on the knowledge that ISC and Cagle had about Hankins, or should have had after a reasonable investigation, it was foreseeable that he would engage in sexual misconduct if given the opportunity afforded by his employment with ISC.

155.    ISC and Cagle also breached their duties to reasonably retain employees. Upon information and belief, Hankins engaged in conduct prior to raping Seelig that put ISC and Cagle on notice that Hankins was unfit to transport vulnerable female detainees without any supervision. Given Hankins's prior conduct, it was foreseeable that he would engage in sexual misconduct if given the continued opportunity to do so.

156.    ISC and Cagle's conduct was the result of malice and/or reckless disregard for Seelig's rights.

157.    Seelig is entitled to recover damages for ISC and Cagle's unlawful conduct, including punitive damages,[3] costs, and attorney fees.

---

[3] A "large majority" of courts in the District of Minnesota allow plaintiffs to pursue punitive damages for their state-law claims per the basic pleading rules of the Federal Rules of Civil Procedure, rather than the gatekeeping rules of Minn. Stat. §§ 549.191, 549.20. *Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 398-400 (D. Minn. 2020).

## COUNT 7
## NEGLIGENT SELECTION OF AN INDEPENDENT CONTRACTOR
### (Defendant Ramsey County)

158.     All paragraphs of this Complaint are incorporated here.

159.     Minnesota law recognizes the tort of negligent selection of an independent contractor. *See Alonzo v. Menholt*, __ N.W.3d __, A22-1796 (slip op. Minn. July 10, 2024).

160.     "[T]o prevail on a claim of negligent selection of an independent contractor, the claimant must prove that the principal did not exercise reasonable care. And the degree of care required will vary depending on the circumstances, … [where] a higher duty is imposed when the work requires special training or skill to perform properly and imposes a high risk of danger if done improperly." *Id.* at slip op. 18.

161.     Additionally, the claim "requires the plaintiff to prove that the principal's negligence was a proximate cause of their injuries." *Id.* at slip op. 19. To prevail, a plaintiff must also demonstrate that "the principal could have reasonably anticipated the harm, which must stem from a quality in the independent contractor that made it negligent for the principal to entrust the work to them." *Id.*

162.     Here, Ramsey County failed to use reasonable care when selecting ISC to be its prison transport contractor. Specifically, Ramsey County either wholly failed to investigate ISC (and therefore failed to discover its pattern of violating detainees' constitutional rights) *or* ignored that ISC was unfit to operate in the State of Minnesota (because it wasn't licensed to do so and had a pattern of violating detainees' constitutional rights).

163.     Ramsey County's failures were unreasonable under any standard of care. But because the endeavor in question (safely and securely transporting vulnerable detainees) poses a high risk of danger, Ramsey County's failures were especially unreasonable under the heightened standard applicable to the conduct.

164.     Ramsey County's negligence caused Seelig's injury. Specifically, Ramsey County's failure to recognize ISC's pattern of constitutional violations and/or failure to act on its knowledge of ISC's pattern of constitutional violations made it foreseeable that ISC would *continue* to engage in constitutional violations against Ramsey County detainees – here, by sexually assaulting Seelig. If Ramsey County had exercised reasonable care, it would not have contracted with a prison transport contractor with a

track record of sexually assaulting dozens of detainees, and the contractor would not have sexually assaulted Seelig.

165.   Ramsey County's negligence was the result of multiple ministerial duties that it was **required** to follow.

166.   Among other ministerial duties, Ramsey County was obligated to ensure that ISC (or any private prison transport company to whom it awarded a contract) was licensed by the State of Minnesota to operate within the State. Ramsey County failed to perform this ministerial duty, or negligently performed the ministerial duty, by contracting with ISC despite ISC's failure to secure a license from the Private Detective and Protective Agent Services Board (the Board). Such a license is mandatory for private prison transport companies to operate in the State, as plainly stated at Minn. Stat. § 326.338, subd. 4(6), and as conclusively settled by the Board **years prior** to Ramsey County selecting ISC as a contractor, *see* Exhibit G at 10.

167.   Ramsey County's failure to perform (or its negligent performance of) this ministerial duty when selecting ISC as a contractor caused Seelig's harm. Specifically, the Board only grants licenses after investigating an applicant to determine its fitness. *See* Minn. Stat. § 326.3381, subd. 2(2). And

the Board disqualifies applicants if the applicant has (1) engaged in acts consistent with criminal sexual conduct, or (2) otherwise "failed to demonstrate to the board good character, honesty, and integrity." *Id.*, subd. 3. Given ISC's longstanding and well-publicized pattern of sexually assaulting its detainees, the Board could not lawfully grant ISC a license to operate in Minnesota. Therefore, if Ramsey County reasonably performed its ministerial duties (by determining whether ISC had a license to operate in Minnesota), it would not have contracted with ISC and ISC's agents could not have continued their pattern of sexual assault by sexually assaulting Seelig.

168.    Among other ministerial duties, Ramsey County was obligated to ensure that ISC always included "a custodial escort of the same sex" *or* that ISC always maintain operational video and audio recording equipment for the duration of any transfer. Minn. Stat. § 631.412 (imposing the ministerial duty on the "sheriff or other correctional officer" – i.e. on Ramsey County – without allowance for delegating the duty to an independent contractor). This ministerial duty applies to every transfer of a detainee like Seelig when traveling "more than 100 miles." *Id*. When ISC transported Seelig, it did not

staff "a custodial escort of the same sex" and did not maintain operational video and audio recording equipment. Upon information and belief, ISC *never* adjusts its staffing to accommodate same-sex escorts for female detainees and *never* maintains operational video and audio recording equipment (or, at the very least, never ensures such equipment exists in every vehicle for every transport).

169.    Ramsey County's failure to perform (or its negligent performance of) this ministerial duty when selecting ISC as a contractor caused Seelig's harm. The plain purpose of § 631.412 is to provide safeguards to deter the abuse of vulnerable detainees like Seelig. And, because Ramsey County failed to comply with the statute, and failed to *ensure* its contractor's compliance with the statute, it enabled ISC to continue its pattern of sexually assaulting detainees without the statutory safeguard created by the Minnesota legislature. Therefore, if Ramsey County had complied with its ministerial duty, ISC would be subject to monitoring (via same-sex escort of video and audio recording) that foreseeably would have deterred ISC and ISC's agents from continuing their pattern of sexual assault by sexually assaulting Seelig.

170.     Alternatively, Ramsey County acted willfully and maliciously in selecting ISC as a contractor.

171.     Seelig is entitled to recover damages for Ramsey County's negligence.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Jennifer Seelig requests that this Court:

A.  Enter judgment in favor of Plaintiff and against Defendants;

B.  Award compensatory damages in such amount as the jury may determine;

C.  Award punitive damages in such amount as the jury may determines;

D.  Grant injunctive, declaratory, equitable or other non-monetary relief as necessary to prevent and deter further unlawful action similar to what is alleged in this Complaint;

E.  Award costs, interest, and attorneys' fees; and

F.  Award any and all additional relief supportable in law or equity.

Plaintiff demands a jury trial.

Dated: July 15, 2024

**MADIA LAW LLC**

By: <u>s/ Zane Umsted</u>
J. Ashwin Madia, MN No. 0321187
Zane Umsted, MN No. 398761
4155 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612.349.2743
Fax: 612.235.3357
jamadia@madialaw.com
zaumsted@madialaw.com
**Attorneys For the Plaintiff**